(89 App. Div. 141.)

PEOPLE v. CAMERON.

(Supreme Court, Appellate Division, Fourth Department. December 1, 1903.)

1. CRIMINAL LAW—NEW TRIAL—NEWLY DISCOVERED EVIDENCE.
    Affidavits of one convicted of robbery, of two fellow convicts, and of others with whom they associated in a saloon on the night of the alleged robbery, tending to prove an alibi, but not made until nine months after the trial, are insufficient ground for the granting of a new trial, where all these affiants were readily available as witnesses at the time of the original trial.

2. SAME.
    The affidavit of the complaining witness on being urged by a partisan of one convicted of robbery, given nine months after the trial, reversing his testimony at the trial, is not sufficient to require the trial court to grant a new trial.
    Spring and Hiscock, JJ., dissenting.

Appeal from Erie County Court.

Robert Cameron was indicted for robbery. From a judgment of conviction, and an order denying a new trial, he appeals. Affirmed.

Argued before McLENNAN, P. J., and SPRING, WILLIAMS, HISCOCK, and STOVER, JJ.

Hamilton Ward, Jr., for appellant.

Edward E. Coatsworth and Frank A. Abbott, for the People.

WILLIAMS, J. The judgment and order should be affirmed.

While in form the appeal is from both the judgment and order, the argument of counsel is for a reversal of the order merely. No argument could well be made upon the record for a reversal of the judg-

¶ 1. See Criminal Law, vol. 15, Cent. Dig. § 2321.

ment. The evidence given upon the trial was clearly sufficient to support the verdict.

The indictment charged the appellant and two other young men with the crime of robbery in the first degree, committed June 15, 1902, at the city of Buffalo, upon one Campbell, in the nighttime, by forcibly and violently taking from his person $12 in money, and carrying it away. The indictment was filed June 30, 1902, a plea of not guilty was entered by appellant, and John J. Sullivan, a lawyer of Buffalo was assigned to defend him. His trial took place July 10, 1902, before the county judge and a jury. A verdict of guilty was rendered, and July 14, 1902 the appellant was sentenced to Auburn State Prison for 19 years. On the trial it appeared that the complainant was a man working about a lithographing shop, where he had been employed for 3 years. He and his brother and one Reims lived in a houseboat at the foot of Genesee street. He owned the boat, and had lived in it since the month of September before. On the night in question he went to see a girl at the corner of Broadway and Spruce streets. He left there about 11:15 o'clock, went over to a saloon on Lloyd street, and had a drink of beer. He then went to a saloon on River street, met a friend, and had a second drink of beer. They left there, and went together to the Frog House, a saloon at the corner of Genesee street and the Erie Canal, and he had a third drink of beer. They left this saloon together, and his friend went up Genesee street, and he went down the street towards his boat. He was entirely sober, had had only three beers, and it was just 12 o'clock. He had to cross a bridge to go to his houseboat, and while crossing that bridge he looked around, and saw two fellows coming behind him. He went a little further, crossed the Grand Trunk Railroad tracks, and just after he was beyond the flag shanty he was set upon by two fellows, while a third stood on the sidewalk, keeping a lookout. One of them struck him two blows, knocked him down, got upon him and held one hand over his mouth and the other upon his throat, and the second one went through his pockets and took the $12, and they carried it away. The fellow who was upon him had his face close to complainant's, and he got a fair look at him, and it was the appellant. He could not forget the face because his face was so close, and he said, "If you holler, you son of a bitch, I will murder you." He had on a light check cap like appellant's produced at the trial, and which he wore that night. It was not very light there. There was a lamp right by the bridge, one halfway between the bridge and the track, and one right at the dock. The electric light was out. After the fellows got through with him, they went towards the bridge, and stood on the bridge a while. He lay still and watched them. They started away from the bridge, and he got up and saw the three go into the Frog House. He reported the matter at once to the police, and they went to the Frog House and arrested the appellant and Murray and Doyle. Appellant had the check cap on that was produced at the trial. It was 1:27 o'clock when they got to the station house. The men were sitting in the back room of the saloon. The front was locked up. Complainant

was brought to the station house and identified appellant. On the trial, complainant said he was positive appellant was the man who knocked him down and held his mouth and throat. There was no evidence given on the part of the defense. The counsel summed up the case, and the court charged the jury.

Upon being examined before sentence, appellant said he was 20 years old; was committed to the State Industrial School in 1896, and again in 1899, for larceny in the second degree; was sent to the Elmira Reformatory in July, 1900, and paroled May 16, 1902; and had been sent to the Erie County Penitentiary for petit larceny on two different occasions. Upon being sentenced, the appellant was taken to prison, July 15, 1902. Nothing further was heard about the matter until about the 1st of April, 1903, nine months after the conviction, when counsel was employed, and set about to get the conviction set aside, and the appellant set at large again. The other two men, Murray and Doyle, who were arrested with appellant and indicted for this offense, were not convicted of the offense, but were convicted about the same time of other highway robberies, and were in State's Prison at Auburn, serving their sentences. Counsel talked with these three convicts and took their affidavits in prison. The counsel made his own affidavit as to his conversation with these men and with Sullivan, appellant's counsel on the trial, and as to what persons employed by him said they learned by talking with other persons, whose names were not stated, and added to all this the statement of his own belief in the premises. This affidavit of counsel is entitled to no consideration. The affidavits of the three convicts themselves were entitled to little, if any, credence. They were sworn to, but statements to counsel when not under oath, and sworn to by him, should not be considered at all. The statement as to what the lawyer Sullivan said as to the trial, his talk with his client, and what investigations he made, not under oath, and only sworn to by the present counsel, were not competent or proper. Sullivan's own affidavit should have been presented. Of course, the affidavit of the present counsel as to his own belief in the premises was of no importance. It was supposed to be that the appellant and his two convict associates would swear to whatever seemed to be necessary to aid the appellant. They concede they were all there at the Frog House on the night in question, and say that they went there together about 10 o'clock to spend the evening; that they met there the two Prusser girls, whose mother and stepfather kept the saloon, and Foley, a man who spent more or less of his time about the place; that these persons passed the time there that night playing cards, drinking beer, singing and visiting in a back room, all excepting Doyle remaining there continuously until the three men were arrested, shortly after 1 o'clock, and, of course, did not leave there, follow Campbell, or commit the robbery upon him. Some statements were made in the affidavits of Doyle and Murray tending to create an impression that other persons committed the crime. The Prusser girls and Foley also made affidavits corroborating the three convicts, and, among other things, testified that appellant and Murray

did not leave the room where they were until arrested. It was stated by Doyle that he was in and out of this room; that he saw the complainant and his friend come into the saloon, drink, and go out, and complainant staggered as if drunk; and that he (Doyle) followed them out, but he went back in the room where appellant and the others were, and they did not commit the robbery. The character of the appellant and his two associates, Doyle and Murray, is not controverted. They were quite young men—appellant 19, Doyle 18, and Murray 23 years of age. All three were in State's Prison for highway robbery—Doyle on his plea of guilty, and the others upon convictions for the same grade of offense. Appellant's record was bad, and had been for years. All these men were received as proper persons to visit and associate with the Prusser girls, and Foley was also associating with them, not only during the proper hours of the night, and until the saloon was closed at 12 o'clock, but up to 1 o'clock and after. How long they would have remained together if the police had not broken up the party, cannot be conjectured. Under these circumstances, we cannot assume or infer that these two girls and Foley were very credible witnesses, or that their affidavits were entitled to very much consideration, especially when they were not produced as witnesses on the trial, where they could be subjected to cross-examination, and the weight of their evidence, and perhaps their real characters, ascertained. The three men were arrested for this crime within an hour after it was committed. If they were in this saloon in this room with these two girls and Foley at the time, so that they could not have committed the crime, they all knew it. It was fresh in their minds, and they could have been called as witnesses and testified to it on the trial, and the appellant could himself have testified to it also. If, then, the story had been true, and the witnesses had appeared credible, and the jury had believed them, a perfect alibi would have been established, and the appellant would have been acquitted. Not one of these witnesses was called, and the appellant was not himself sworn. No proof was given on the trial that these three men were in the saloon when the complainant went in with his friend before the robbery and drank there. No proof that either of these men saw the complainant in the saloon, and saw them go out, and what way the complainant went. These affidavits supplied these facts. It was agreed by all these witnesses that the three men were there from a little after 10 o'clock, and Doyle swore that he saw the two men coming in to drink, and complainant appeared to be intoxicated, and he followed them out and saw them go away, and that he then soon after returned to the presence of the others in the back room of the saloon. These men were bad enough to commit the crime in question. Doyle and Murray did commit crimes of the same nature about that time. There is every probability these three men did leave the room for a sufficient length of time to commit this crime, and did commit it. The place was in the immediate vicinity, but a few rods away; only a few minutes were necessary to accomplish it; and we cannot, under the circumstances, credit even the affidavits of the girls and Foley so far as to establish

the alibi now alleged, but not suggested or attempted to be proved on the trial. This is not newly discovered evidence. It was well known and understood, if true, at the time of the trial, which took place only 30 days after the commission of the offense. This kind of practice should not be tolerated in criminal cases. A perfect defense of alibi, susceptible of proof if true to the knowledge of the appellant, the witnesses right in the city where the trial was had, and no suggestion of it made at the trial, and this defense is attempted to be sprung upon the court nine months after, when complainant, whose evidence is absolutely necessary to a retrial, has gone beyond the jurisdiction of the court, and his attendance on such retrial cannot be enforced. Our State's Prisons may readily be relieved of their prisoners if such loose practice is to be indulged in. It is contrary to the well-settled rules applicable to motions for new trials on the ground of newly discovered evidence, and the provisions of subdivision 7, § 465, Cr. Code. This evidence was not newly discovered. It has the appearance, rather, of having been newly manufactured. Appellant says he was ashamed to communicate with his father when arrested. His past record would not indicate that he would be ashamed of anything. He pretends to excuse the course of the trial by saying that he had no money to pay counsel, and his counsel advised him not to be sworn. He needed no money to get these witnesses. His counsel needed to make no investigation to ascertain who the witnesses were. Appellant knew all of them, and could give their names and tell where they lived. The court should not rely upon any excuse given by him as to the course of the trial, so far as his counsel was connected with it. The counsel lived in Buffalo, and, if his affidavit could in any way aid the appellant upon the motion, it should have been, and, we assume, would have been, produced.

The only additional reason alleged for granting a new trial was the claim that the complainant had acknowledged he was mistaken in his identification of appellant on the trial. After the affidavits already referred to had been obtained, the complainant was located over in Canada; and, without having any interview with him, counsel prepared a typewritten affidavit in his office, and sent a young law student over to see if he could get the complainant to swear to it. The record does not show what this blank affidavit so prepared contained when it left the counsel's office. It was changed over there, and what those changes were does not appear. The young law student took a notary public of Canada, and went and had an interview with the complainant. The notary testified that there was much conversation between the complainant and the law student, and finally the complainant admitted that he did not think it was appellant who had robbed him. The law student testified that he discussed the matter at great length with complainant, and the latter finally stated that he did not then believe that appellant was the man who robbed him. Neither the notary nor the law student, however, stated the talk and discussion had between the two parties which led the complainant finally to express the belief that appellant

was not the man who robbed him. Complainant's affidavit, as sworn to, stated, substantially, that he had been thinking over the said assault and robbery, and had come to the conclusion that he was in error in positively identifying the appellant; that it was not a dark night, and he was not under the influence of liquor; that he did not say it was not appellant, but he was not as positive as he was at the time he testified; that, in thinking the matter over, he knew it was not the appellant who assaulted him. Complainant was a laboring man, and the man talking with him was a young law student. It apparently required quite an extended discussion by the law student to procure the concessions from the laboring man; and whether the appellant fully appreciated the exact language used in the affidavit as he finally subscribed and swore to it, is not entirely clear. After such extended discussion, nine months having elapsed since the robbery occurred, he might well feel less positive as to the identification than he did at the trial. It is a little singular that he should have at last assented to the statement that, "in thinking it over, he knew it was not appellant who assaulted him," when he had already stated in the same paper merely that he was in error in positively identifying him; that he could not say it was not he, but he was not then as positive as at the trial. The law student put down the last expression a little too strong—that he knew it was not appellant. He could not well have known that. The whole transaction of securing this ex parte affidavit from the complainant was, to say the least, one of questionable propriety. It would have been much wiser and better to have brought the man before the county judge, and had a fair examination of him. The effort was to get the best affidavit from him, in the interest of the appellant, which the discussion and talk with him could induce him to assent to, rather than to let him talk for himself, and write down what he said, and have him swear to that. But little reliance can be placed upon affidavits obtained under these circumstances. This man on the trial positively identified appellant as one of the three men, and he gave good reasons for being positive. He made no attempt to identify the other two. It was not a dark or a light night. He could see across the street, he said, and he did see up the street, and see the three men leave the bridge and go into the saloon. The man who knocked him down got upon him, and held his throat and covered his mouth, had his face close down to his, and he had such a cap on as appellant wore that night, and he said, "If you holler, you son of a bitch, I will murder you." Complainant had a good view of him, and he saw him only a few hours after, while the face was still remembered, and those terrible words were yet fresh in his mind, and he then said he was positive. During the nine months which elapsed before the law student interviewed him, much of the vividness of that view of appellant, accompanied by the words uttered by him, may have passed away. But human evidence must be relied upon, and the evidence of such an identification must be relied upon; otherwise there could rarely be a conviction had for this high crime, which ofttimes results in tak-

ing human life.  There seemed to be a good deal of it in Buffalo at that time.  Here were three young men found guilty of this grade of crime about the same time.  The courts should not deal lightly with their convictions.  The county judge who presided at this trial lived in Buffalo, heard this motion, examined these papers, and denied the motion.  We would not reverse his decision.

The judgment and order should be affirmed.

McLENNAN, P. J., and STOVER, J., concur.

SPRING, J. (dissenting).  The indictment charged, and the defendant was convicted of, robbing, in company with two others, one Campbell, of $12 in money and a knife, in the city of Buffalo, shortly after 12 o'clock on the morning of June 15, 1902.  The conviction was founded upon the testimony of Campbell, who testified that he recognized the defendant as one of his assailants, and subsequently identified him in the police station.  Campbell testified that after going into the Frog House Saloon, on Genesee street, about 12 o'clock, and drinking a glass of beer, he started for home, and on his way was attacked, knocked down, and robbed by the defendant and two other men.  Campbell had drunk beer in four different saloons shortly before the alleged robbery, and it was "pretty dark" where the crime was committed.  According to his testimony, the defendant, with his companions, returned to this saloon, and were arrested shortly afterwards by the police, but neither the money nor the knife was found in their possession.  No proof was offered on behalf of the defendant, and the evidence presented was sufficient for the jury to find the defendant guilty of the crime charged.  Upon the motion for a new trial, the affidavits of two young men, each serving a sentence in the State's Prison at Auburn for robbery, were presented to the court, setting forth that the defendant was in the saloon with them during the entire evening when the robbery was committed.  Very little credence can be given to these affidavits, in view of the character of the affiants.  In addition to those affidavits, however, the defendant included among his moving papers the affidavits of John Foley, Lena Prusser, and Florence Prusser.  Foley testified:  That he was at the Frog House Saloon from 7:30 on the evening of June 14th until about 1:30 the next morning.  While he was in the saloon, and about 10 o'clock, the defendant and the man Murray came in, and passed through into the dining room in the rear of the saloon, and that he (Foley) followed them into that room.  All of them remained in there with the two Prusser girls until the time of the arrest, except Foley, who started for home about 1:30, and, after going a short distance, saw the police at the saloon.  Others were in and out of the saloon during this evening.  The facts contained in Foley's affidavit are corroborated by the affidavits of the two girls, who are unequivocal in stating that Cameron, the defendant, remained in the dining room continuously from 10 o'clock until the time of his arrest.  These three witnesses are not impeached, nor is the character of either of them assailed by any counter affidavits

presented on behalf of the people. There is nothing in the record showing any bias or interest to warrant the charge that these people have committed perjury. The fact, of course, does appear that all were in this saloon associating familiarly with young men of bad character. What knowledge these affiants had of the character or reputation of the defendant or. of his associates in the saloon does not appear. The two Prusser girls apparently lived in the saloon; their parents were present during the evening; and, while their associates necessarily would not be of the most refined people, yet we are not to infer from this fact that they would testify falsely. In addition to these papers, the affidavit of Campbell was used upon the motion, in which he stated that on reflection he had come to the conclusion he was in error in testifying upon the trial he positively identified Cameron as one of his assailants on the night of the robbery, and then goes on to say "that deponent does not now say that it was not the said Cameron, but deponent does say that he is not as positive as he was at the time he testified; that, in thinking the matter over, he knows that it was not the said Cameron who assaulted him." Campbell was living in Ontario, Canada, at the time he verified this affidavit. A proposed affidavit had been prepared by the counsel for the defendant, and by his clerk submitted to Campbell, who directed changes to be made in it, which was done. The clerk and the notary before whom the affidavit was verified make affidavits in which they say that Campbell said he did not believe Cameron committed the robbery. We have, therefore, this situation presented: The affidavits of three apparently disinterested persons, whose reputation is not impugned by any one, setting forth facts which, if true, show that Cameron, bad as he may be, did not commit the crime of which he has been convicted. Then we have the affidavit of the complaining witness, who alone connected the defendant with the crime, asserting that he was in error in testifying that the defendant was one of those who assaulted and robbed him. Desirable as it is that criminals should be brought to justice, it cannot be that the most rigorous enforcement of our criminal law will justify the conviction of this young man of 20 years, and his imprisonment for 19 years, without a further opportunity to prove his innocence.

It is urged that a complaining witness may often be induced after a trial to change his testimony upon being requested so to do upon behalf of a defendant. If that change goes to the very pith of his testimony, and, if true, shows that the one charged with the commission of a grave crime is innocent, courts should not hesitate to allow the convicted person a new trial, especially where the changed story is corroborated by other proof, as in this case. A young man should not be compelled to serve out a long term in a State's Prison, the only warrant for which is the testimony of a man certainly not of high character, who solemnly declares he testified falsely when he swore the convicted man committed the crime.

Cameron is of unsavory character. He undoubtedly is of no benefit to society, and probably it is better for the public that he be in State's Prison. He is now incarcerated, however, for a particular

crime, and even a bad man should not be imprisoned for an offense which subsequent developments indicate he did not commit. It is urged that he was not vigilant, if innocent, in preparing for his defense, and that he did not testify in his own behalf. When arrested he had no money. He did not advise his father that he was accused of a crime. Counsel was assigned him, who advised him not to be sworn; and Mr. Ward states in his affidavit that he was informed by this counsel that he visited Mrs. Piersall, the mother of the Prusser girls, but obtained no information from her. Upon motions of this character, involving the liberty of a young man for many years, we ought not to adhere too closely to technical rules of practice. The controlling rule in the disposition of these motions should be that if, upon another trial, there is a fair likelihood the defendant will be able to establish his innocence, the opportunity should be afforded him. The suggestion that, by reason of the retraction of Campbell, there is little prospect of securing another conviction, has no merit. On the contrary, it tends to establish the fragile character of the people's case.

We think, in view of these affidavits, the defendant should have another trial.

HISCOCK, J., concurs.